UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

In re
GLYCOGENESYS, INC. f/k/a
SAFESCIENCE, INC. f/k/a                           Chapter 7
IGG INTERNATIONAL, INC.,                          Case No. 06-10214-JNF
INTERNATIONAL GENE GROUP, INC., and               (Jointly Administered)
SAFESCIENCE PRODUCTS, INC.,
    Debtors

# MEMORANDUM

## I. INTRODUCTION

Several contested matters are before the Court: 1) the Chapter 7 Trustee's Motion to Assume and Assign Certain Executory Contracts; 2) the Motion by Chapter 7 Trustee for Authority to Sell by Private Sale Certain Assets of the Debtors Free and Clear of All Liens, Claims, Encumbrances and Interests; and 3) the Application of Dr. David Platt and Pro-Pharmaceuticals for Allowance of Chapter 11 Administrative Claim. Dr. David Platt and Pro-Pharmaceuticals, Inc. (collectively, "Dr. Platt") filed an Objection to the Chapter 7 Trustee's Motion to Assume and Assign. The Court heard the Motions on September 25, 2006. The Court conducted an evidentiary hearing with respect to the Motion to Assume and Assign Certain Executory Contracts and Platt's Objection on that day, as well as on September 26, 2006 and October 4, 2006. Six witnesses, including the Chapter 7 Trustee and Dr. David Platt, testified at the hearing and 17 exhibits were introduced into evidence.

1

Through his Motion to Assume and Assign Certain Executory Contracts, the Chapter 7 Trustee seeks to assume and assign over 50 executory contracts to Marlborough Research & Development, Inc. ("Marlborough"), all as are described on Exhibit A to the motion, including a License Agreement between International Gene Group, Inc. and Dr. David Platt (the "License Agreement"). Through his Motion for Authority to Sell Certain Assets of the Debtors, the Chapter 7 Trustee seeks to sell the Debtors' right, title and interest related to the Debtors' intellectual property portfolio, including patents, patent applications, trademarks, service marks and licenses, certain equipment, books, records, electronic data, files and certain executory contracts related to the Debtors' "GCS 100 drug products, program or business," all as described on Exhibit A to the motion.

There are two issues presented: 1) whether the Chapter 7 Trustee has sustained his burden under 11 U.S.C. § 365(c)(1)(B) to demonstrate that the License Agreement may be assumed and assigned without Dr. Platt's consent in view of the restriction on transferability in the License Agreement; and, 2) whether the Chapter 7 Trustee has satisfied his burden under 11 U.S.C. § 365(b)(1)(A) and (B) to demonstrate that defaults in the performance of obligations to Dr. Platt will be cured by the payment of cure costs,[1] and that Dr. Platt will be provided adequate assurance of future performance under the License Agreement. The Court now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

---

[1] The Trustee sets forth a cure cost of $240,000; Dr. Platt, in his Objection sets forth cure costs of $250,518.40.

2

## II. FACTS

GlycoGenesys, Inc. ("GlycoGenesys") and its two non-operating, wholly-owned subsidiaries, International Gene Group, Inc. and SafeScience Products, Inc.,[2] filed voluntary Chapter 11 petitions on February 2, 2006. The Debtors are jointly administered pursuant to an order of this Court dated February 16, 2006.[3] The Court allowed the Debtors' Motion for Joint Administration in which the Debtors represented that they were under common management and control and that the Debtors were affiliates as that term is defined in 11 U.S.C. § 101(2) and as used in Fed. R. Bankr. P. 1015(b). With the assent of the Official Committee of Unsecured Creditors, the Debtors filed motions to convert their Chapter 11 cases to Chapter 7 on May 31, 2006, and the United States Trustee appointed Mark G. DeGiacomo the Chapter 7 Trustee for all three Debtors on June 1, 2006.

GlycoGenesys was a publicly-traded, biotechnology company focused on carbohydrate-based drug development for the treatment of various forms of cancer. Its leading drug candidate is a drug known as GCS-100LE, a refinement of a drug identified as GCS-100. GCS-100LE is a compound with a substantially reduced amount of ethanol, which has the potential to adversely interact with other chemotherapies. GCS-100LE was being clinically tested when the Debtors filed their Chapter 11 petitions. Indeed, clinical

---

[2] To avoid confusion, this Memorandum will refer to the full corporate names of all parties, other than GlycoGenesys, without abbreviation.

[3] The Debtors are not yet substantively consolidated, however, the Trustee indicated at the evidentiary hearing his intention to file a motion for substantive consolidation.

3

trials were taking place at the Dana Farber Cancer Institute in Boston, Massachusetts.

At the evidentiary hearing, the Trustee introduced Plaintiff's Exhibit No. 10, a Form 10/A of IGG International, Inc., the prior name of GlycoGenesys, filed by IGG International, Inc. with the Securities and Exchange Commission ("SEC") on July 25, 1995 (the "Report") which sets forth a corporate history of GlycoGenesys, its predecessors and subsidiaries.[4] According to the Report, IGG International, Inc. was a developmental stage enterprise formed under the laws of the State of Nevada under the name Alvarada, Inc., on April 6, 1987. On March 7, 1995, Alvarada, Inc. completed a reverse acquisition, wherein the majority shareholders of International Gene Group, Inc., a Michigan corporation founded by Dr. Platt in 1992, transferred their stock to Alvarada, Inc. for majority control of Alvarada, Inc. On May 28, 1995 Alvarada, Inc. changed its name to IGG International, Inc. In 1998, IGG International, Inc. changed its name to SafeScience, Inc. On May 31, 2000, the board of directors of SafeScience, Inc. ousted Platt from the company. In October 2001, SafeScience, Inc. changed its name to GlycoGenesys.

Dr. Platt is a leader and innovator in the field of novel saccharides for the treatment of various cancers. In March of 1993, he filed a patent application with the Patent and Trademark Office (the "PTO") with respect to a chemotherapeutic agent identified as

---

[4] The parties attempted to provide a corporate history of GlycoGenesys and its subsidiaries in various pleadings and affidavits. However, the facts elicited from these sources have proven ambiguous, partially because of the similarity of corporate names in this matter and parties' varying, and sometimes conflicting, use of abbreviations. Accordingly, the Court will limit its recitation of the corporate history in this matter to facts contained in the Report and testimony given at the evidentiary hearing.

4

"Modified Pectin." The Application, known as the 487 Application, is the subject of an interference proceeding pending in the PTO. The interference proceeding stems from the filing, on or around July 7, 1994, of a patent application by Ayram Raz ("Raz")of the Barbara Anne Karmanos Cancer Institute ("KCI") of Wayne State University ("WSU"), and Kenneth Pienta ("Pienta") of the University of Michigan, with respect to a modified pectin for the treatment of prostate cancer. Raz and Pienta eventually obtained a patent with respect to their formulation which they assigned to WSU and KCI. The details of the interference proceeding, as well as the chronology of events giving rise to the arbitration proceeding initiated by GlycoGenesys and International Gene Group, Inc. against Dr. Platt are detailed in the "Award of Arbitrator," dated November 10, 2004. In sum, the arbitration proceeding involved claims and counterclaims of the parties with respect to the License Agreement which the Trustee now seeks to assume and assign.

On January 7, 1994 , Dr. Platt and International Gene Group, Inc., at present a subsidiary of GlycoGenesys, entered into the License Agreement governed by Michigan law. As determined by the Arbitrator, the License Agreement covered all patents and patent applications listed in an appendix, "as well as any patents issuing from said applications, and any divisions, continuations, continuations-in-part, or re-issues of said patents and patent applications, improvements, as well as all foreign equivalents of the foregoing." Platt granted International Gene Group, Inc. "an exclusive worldwide, royalty-bearing license to make, use, have made, sell, lease or otherwise transfer Licensed Products," defined as "all products whose manufacture, use operation is covered by an

unexpired claim of a Licensed Patent." Additionally, International Gene Group, Inc. agreed to "pay all filing fees, maintenance fees, costs of patent application preparation and prosecution and take all other steps necessary to perfect and maintain the Licenced Patents" and to make an annual minimum royalty payment in the sum of $50,000. The License Agreement contains no express provisions requiring International Gene Group, Inc. to commercialize the Licensed Patents. However, the Arbitrator determined that both parties contemplated and anticipated that International Gene Group, Inc. would commercialize the Licensed Patents because it had no other business in January of 1994. The License Agreement provides that "[t]he license granted hereunder shall be transferable by IGG [International Gene Group, Inc.] to a successor in interest of all, or substantially all of its business without the prior approval of Platt provided said successor agrees in writing to be bound by the terms and conditions of this Agreement." The License Agreement was amended on April 14, 1999. The parties added several issued patents and pending patent applications and extended from the sixth to the ninth calendar year the $50,000 minimum royalty payment.

The Award of Arbitrator is significant for the reason that the Arbitrator made important findings as to the rights and obligations of GlycoGenesys and International Gene Group, Inc. on the one hand, and Dr. Platt, on the other. First, the Arbitrator found that "GlycoGenesys conducts its business through two wholly-owned subsidiaries, International Gene Group, Inc. and SafeScience Products, Inc." Second, the Arbitrator noted: "In contrast to many patent license agreements (including, for example, the contract

6

between GLGS [GlycoGenesys] and WSU/KCI), there is no express reference to *control* of patent prosecution." The Arbitrator added:

> Ordinarily, when an inventor licenses a patent application, the inventor retains the ultimate right to control prosecution, absent a contrary contractual provision. The inventor stands behind the inventor's oath, 35 U.S.C. § 115, and is responsible for observing the duty of candor, *i.e.*, duty to disclose to the PTO information material to patentability. 37 CFR § 1.56. Here, Platt did not expressly relinquish his right to control prosecution. . . . GLGS's [Glycogenesys] right to prosecute was subject to Platt's right to control and direct that prosecution.

The Arbitrator also noted that in the year before the commencement of the Arbitration proceeding, GlycoGenesys tendered Platt a $50,000 royalty payment under the License Agreement and Platt accepted the payment.

Following Dr. Platt's departure from SafeScience, Inc., WSU/KCI entered a license agreement, effective January 26, 2001, pursuant to which, according to the Arbitrator, "WSU/KCI licensed to Safe Science[, Inc.] the Raz Patent (and other patents and applications) in exchange for $2 million, an additional $3 million in milestone payments, options to purchase SafeScience[, Inc.] equity and percentage royalties on certain sales." Additionally, SafeScience obtained the right to direct WSU/KCI to amend the Raz Patent or take any other action to avoid, overcome or terminate any interference proceeding between the Raz Patent and the 487 Application."

Around this time, SafeScience, Inc. discontinued its consumer and commercial product lines which it had begun developing in 1996 and began examining alternatives for its agricultural product line. Indeed, SafeScience, Inc. changed its name to GlycoGenesys in October of 2001 to reflect the new focus of its business. By the time the Debtors filed their

Chapter 11 petitions, they had discontinued the development and marketing of agricultural and chemically-safe consumer products. According to the Debtors, in pleadings filed with this Court at the time of the filing, their business was comprised of two license agreements for the use of intellectual property associated with the GCS-100 drug candidate. They described the licenses as follows:

> The licenses are with Wayne State University and the Barbara Ann Karmanos Cancer Institute, and with David Platt, a co-founder, former director, and Chief Executive Officer of the Company. GCS-100 has been evaluated in previous clinical trials at low dose levels in patients with colorectal, pancreatic, and other solid tumors with stable disease and partial response documented. The Company has an ongoing Phase I dose escalation trial to evaluate higher dose levels of GCS-100LE, a low ethanol formulation of GCS-100, at Sharp Memorial Hospital, Clinical Oncology Research in San Diego, California and the Arizona Cancer Center in both Tucson and Scottsdale, Arizona. In addition, GCS-100LE is being evaluated in a Phase I/II trial for multiple myeloma. This study has been initiated at the Dana-Farber Cancer Institute in Boston, Massachusetts; Roswell Park Cancer Institute in Buffalo, New York; and Emory's Winship Cancer Institute, Atlanta, Georgia.

Although GlycoGenesys and its subsidiaries, which the Chapter 11 Debtors represented were under common management and control,[5] had discontinued agricultural and chemically-safe product lines, the Chapter 11 Debtors filed motions to sell to Plant Defense Boosters certain finished inventory and raw material components of an anti-fungal agricultural product and an EPA registration and trademark relating to a pest control product for $50,000. In their Motion, they stated that, from 2001 through June of 2004, they engaged in only "limited activities" with respect to their so-called Elexa product line solely

---

[5] *See* Motion by Debtors and Debtors-In-Possession for Entry of Order Directing Joint Administration of Chapter 11 Cases.

to preserve its value.

Additionally, the Chapter 11 Debtors sold by way of a web auction certain laboratory equipment and other personalty, realizing approximately $75,000 from the online sales. While in Chapter 7, the Trustee abandoned certain personal property, including cleaning supplies, plastic bottles, dispensers, used office furniture and equipment, and non-clinical grade commercial GCS-100 and pectin located in Somerville, Massachusetts and Allentown, Pennsylvania.

The Chapter 7 Trustee did not abandon, and, pursuant to the Motion for Authority to Sell by Private Sale, now proposes to sell to Marlborough the Debtors' clinical-grade drug supplies located at Fisher Clinical Services, Inc., as well as all inventory, "all material on stability, all bulk material, all other retains [sic], all raw material and all work in progress for GCS 100LE and GCS-00 (including all prior formulations) within the care, custody, or control of the Trustee." These assets are denominated "GCS Inventory" in the Purchase and Sale Agreement.

The Chapter 7 Trustee's testimony and the testimony of John W. Burns ("Burns"), the Chief Financial Officer of the Debtors at the time of their Chapter 11 filings, confirmed the Chapter 11 Debtors' prior representations, namely that in February of 2006 the Debtors' business was developing GCS-100 and GCS-100LE and obtaining regulatory approval for commercial distribution of pharmaceutical products associated with GCS-100 and GCS-100LE after completion of clinical studies. Burns testified that in 2001 the business of International Gene Group, Inc., as a subsidiary of Glycogenesys, became the primary

9

business of the parent company and, as noted above, that SafeScience changed its name to GlycoGenesys to reflect the shift in focus of the company. Moreover, Burns testified that International Gene Group, Inc. was funded by its parent and its only source of capital was cash "downstreamed" by GlycoGenesys. International Gene Group, Inc. never raised any money or generated any revenue on its own. Nevertheless, it filed separate tax returns, and its Schedules of Assets and Liabilities show that it had limited debt and, other than cash, it had only a single asset, namely the License Agreement with Dr. Platt. It listed just two creditors with unsecured, nonpriority claims in unknown amounts - - the Commonwealth of Massachusetts and Dr. Platt.

Burns further testified that the Debtors have retained approximately 6,000 vials of GCS-100LE, an amount sufficient to begin clinical trials. Dr. George Tidmarsh ("Tidmarsh") and James Rolke ("Rolke"), the former manager of process development at GlycoGenesys, elaborated upon Burns' testimony discussing purposes and goals of the various phases of clinical trials, as well as the availability and viability of the vials of GCS-100 that can be used immediately in clinical trials.

Joseph Grimm ("Grimm"), the president of Marlborough, a "start-up" company, testified extensively about his background in the biotechnology sector and his relationship with Marlborough's financial backers, Kevin Tang and Tang Capital Management, LLC, which has a fund with over $100 million dedicated to launching small companies. Grimm represented that he had 30-years of experience in finance and corporate development and he further stated that he had been involved in "two IPO's, and a number of secondary

offerings," adding that he had also done "corporate partnering deals with Merck, J&J, Wyeth, [and] Boston Scientific." Grimm described the team he planned to have in place if the Court were to approve the Trustee's Motion, and he submitted certain financial statements of Marlborough, including its projected cash flow. He did not have written agreements with all members of his team, and testified that most members would be compensated with an equity participation in the new venture. Grimm stated that he planned to engage Tidmarsh, Rolke, Spiro Jamis, whom Grimm described as a "pioneer" in the biotechnology section, Karen Tuberty ("Tuberty"), a former director of hematology and oncology at Wyeth, and Andy Magee ("Magee"), an analytical chemist.

Dr. Tidmarsh, who trained as a pediatrician and oncologist at Stanford University, has impressive credentials as a clinician, research scientist and biotechnology entrepreneur. For example, he founded Threshold Pharmaceuticals and with a $750,000 initial investment, developed a drug known as Bexxar, which he brought from preclinical development into the clinical trials, raising $41 million upon the signing of a licensing agreement, and over $100 million in a secondary offering after the company became public. Grimm testified that Dr. Tidmarsh would receive compensation in the form of equity and would serve as the chief medical and scientific officer. Grimm described Turberty's role as that of a consultant for clinical and regulatory affairs at $225 per hour, while Rolke and Magee would be employed for their expertise as chemists in the development of pharmaceuticals.

Grimm testified about Marlborough's financial statements. He indicated that Tang

11

Capital increased its initial funding and that the company would have "a starting point" of $4.5 million in cash and that Marlborough recognized and budgeted for Dr. Platt's retention of control of the interference proceeding and the 487 Application. He added that Marlborough had clearly identified its cure costs and would have cash at the end of September 30, 2007 of $1.676 million even after the allocation of $1.41 million for clinical drug trials, which would be predicated upon the assumption of the Debtors' executory contract with Fisher Clinical Services, Inc. which is storing the vials of GCS-100LE needed to conduct clinical trials. Moreover, Burns testified that a batch of GCS-100LE containing approximately 2,000 vials would cost about $200,000 to produce.

Dr. Platt testified about the financial projections and team of scientists and managers put together by Grimm. Although he opined that Marlborough had insufficient funds to commercialize GCS-100 and he criticized Grimm's management team, his testimony was conclusory and inconsistent with his own experience as a biotechnology entrepreneur. It was marked by obvious prejudice and hostility. In short, it was unpersuasive.

### III. DISCUSSION

It is undisputed by the parties that the License Agreement is the property of International Gene Group, Inc., the wholly-owned subsidiary of GlycoGenesys. *See* Defendant's Exhibit B- Schedule B-Personal Property filed by debtor International Gene Group, Inc.

Section 365 of the Bankruptcy Code provides in relevant part the following:

(a) Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor.

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee--

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, . . .
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease. . . .

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if--

> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease *from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession,* whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment. . . .

(f)(1) Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

13

> (2) The trustee may assign an executory contract or unexpired lease of the debtor only if--
> > (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
> > (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(b), (c), and (f)(emphasis added). Because Dr. Platt does not consent to the transfer of the License Agreement to Marlborough, this Court must consider whether the terms of the License Agreement and/or applicable law excuse Dr. Platt from accepting performance from or rendering performance to an entity other than debtor International Gene Group, Inc. Generally, under federal common law, non-exclusive patent licenses are not assignable in the absence of express language. Stenograph Corp. v. Fulkerson, 972 F.2d 726, 729 n.2 (7th Cir. 1992). *See generally* Everex Sys., Inc. v. Cadtrak Corp. (In re CFLC, Inc.), 89 F.3d 673, 679 (9th Cir. 1996). In the instant case, Dr. Platt granted International Gene Group, Inc. an exclusive license with the respect to the patent products and the License Agreement expressly permits assignment subject to the restriction discussed below. *Cf.* Institut Pasteur v. Cambridge Biotech Corp., 104 F.3d 489 (1st Cir. 1997), *cert. denied*, 521 U.S. 1120 (1997). The Court concludes that federal common law does not preclude the Trustee from assuming and assigning the License Agreement. *See* Murray v. Franke-Misal Technologies Group, LLC. (In re Supernatural Foods, LLC), 268 B.R. 759 (Bankr. M.D. La. 2001).

The Court must determine whether Dr. Platt is excused from accepting performance from or rendering performance to Marlborough, the proposed assignee of the

14

License Agreement, or whether the express terms of the License Agreement provide for his consent to the assignment under the circumstances of this case. As noted above, the License Agreement contains a restriction on its assignment. It provides: "[t]he license granted hereunder shall be transferable by [International Gene Group, Inc.] to a successor in interest of all, or substantially all of its business without prior approval of Platt provided said successor agrees in writing to be bound by the terms and conditions of this Agreement."

Dr. Platt argues that because International Gene Group, Inc. was a non-operating subsidiary of GlycoGenesys with a single asset, other than cash, the License Agreement cannot be transferred because there can be no successor in interest to "all, or substantially all of its business." He maintains that International Gene Group, Inc. was not, and is not "in business." Dr. Platt contends that prior to the bankruptcy, International Gene Group, Inc. transferred substantially all of its business operations and assets, except the License Agreement, to its corporate parent, GlycoGenesys, leaving the License Agreement "stranded" in the subsidiary. He points out that following the bankruptcy filing, the Debtors and the Trustee sold or abandoned certain equipment, furniture, inventory, raw materials and other personal property of the Debtors. Accordingly, the proposed assumption and assignment of the remaining License Agreement is a sale of a "left-over" asset which can not be considered a sale of "all or substantially all of the business" as required by the License Agreement as a condition of transferability.

The Chapter 7 Trustee maintains that Dr. Platt has consented to the assignment to

15

Marlborough because the sale and assignment does constitute a transfer of all of International Gene Group, Inc.'s business. Both parties agree that 11 U.S.C. § 365(c)(1)(A) applies, and that Dr. Platt cannot be compelled from accepting performance from any entity other than International Gene Group, Inc., except in accordance with the express terms of the License Agreement. Thus, the threshold issue presented is whether the current proposed sale is a sale of all or substantially all of the business of International Gene Group, Inc. and/or the Debtors and thus the License Agreement can be assigned over Dr. Platt's objection.

Although the parties agree that Michigan law applies to the interpretation of the License Agreement, neither the parties nor the Court were able to locate any decisions interpreting the meaning of the term "substantially all of the business" under Michigan law. Michigan law, however, does require that interpretation of a contract begin with the plain meaning of the contract's language, that construction of a contract should effectuate the parties' intent, and that a contract's terms should be interpreted in accordance with commonly used meanings. *See* Henderson v. State Farm & Cas. Co., 460 Mich. 348, 596 N.W. 2d 190 (1999); Old Kent Bank v. Sobczak, 243 Mich. Ct. App. 57, 620 N.W. 2d 663 (2000).

Applying these principles, the Court rejects Dr. Platt's narrow view of the business of International Gene Group, Inc. and GlycoGenesys. The Court finds that Dr. Platt's argument elevates form over substance and ignores the reality of how the Debtors operated. As Burns testified, the Debtors operated under common management and

control, and funds obtained by International Gene Group, Inc. were "downstreamed" from GlycoGenesys. The evidence demonstrated that the Debtors' business primarily consisted of the development and commercialization of carbohydrate-based cancer drugs, in particular GCS-100 and GCS-100LE, which were developed, manufactured, and the subject of clinical trials pursuant to the patents licensed to International Gene Group, Inc. under the License Agreement. The Debtors were still in the process of developing these drugs when they commenced their Chapter 11 cases. The main businesses, including International Gene Group, Inc., of the Debtors and the majority of their assets consisted of the intellectual property and the inventory of carbohydrate-based cancer therapies. The assets sold by the Debtors during the pendency of the Chapter 11 cases were not integral to the development or commercialization of GCS-100 or GCS-100LE. Certain assets sold related to the agricultural and pesticide consumer product lines of SafeScience, Inc. Other assets sold were laboratory equipment and office furniture used by the Debtors in their laboratory operations. The equipment was not essential to the Debtors' development of its pharmaceutical products which were manufactured by a third party.

It is also significant that Dr. Platt has accepted GlycoGenesys's performance in the form of payment of royalties on behalf of International Gene Group, Inc. Dr. Platt testified that he founded International Gene Group, Inc. in 1992. At the time he executed the License Agreement in 1994, he was the licensor and, according to his testimony at the evidentiary hearing, he controlled the licensee. He acted simultaneously for both parties to the License Agreement. Had he wanted to foreclose any possibility of the transfer of the

License Agreement, as its drafter, he could have done so. The language of the License Agreement cannot be used to circumvent the reality of the Debtors' business both before and after the bankruptcy filings. International Gene Group, Inc.'s and GlycoGenesys's businesses were and are one and the same, and the Debtors collectively may transfer the License Agreement to Marlborough without violating either Michigan law or the provisions of 11 U.S.C. § 365(c).

The Court finds that the Trustee has satisfied that burden under 11 U.S.C. § 365(b)(1) and (f)(2), which provisions require "adequate assurance of future performance" of an executory contract, such as the License Agreement, which is the subject of a proposed assignment. The term is not defined in the Bankruptcy Code. Courts interpreting the requirement have adopted a pragmatic approach, focusing on the assignee's "ability to fulfill the financial obligations" under the contract. *See, e.g.*, In re Martin Paint Stores, 199 B.R. 258 (Bankr. S.D. N.Y. 1996); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524 (Bankr. D. N.J. 1988). Thus, it is appropriate to evaluate the financial condition of the assignee and the likelihood that the non-debtor party will receive the benefit of its bargain from the assignee. *See* In re Casual Male Corp., 120 B.R. 256, 264-65 (Bankr. D. Mass. 1990).

In the present case the evidence is unrebutted that Marlborough, although a start-up company, has sufficient cash to satisfy the cure costs and provide adequate assurance of payment of Dr. Platt's royalties. The Trustee, through his own testimony as well as the testimony of Grimm, Tidmarsh and Rolke about Marlborough's business plan, financing,

and scientific expertise, has established adequate assurance of Marlborough's future performance under the License Agreement. Grimm, in particular, recognized and testified that Marlborough has budgeted sufficient funds to pay all filing fees, maintenance fees, costs of patent application preparation and prosecution and can take all other steps necessary to perfect and maintain the Licensed Patents; that it has budgeted sufficient sums for the "reasonable costs" associated with Dr. Platt's extension of "all reasonable and necessary cooperation" in connection with efforts to enforce his rights under the License Agreement; that it can and will make the $50,000 minimum royalty payments; and that it will otherwise comply with the terms of the License Agreement.

## IV. CONCLUSION

In accordance with the foregoing, the Court shall enter an order overruling Dr. Platt's Objection and granting the Chapter 7 Trustee's Motion to Assume and Assign Certain Executory Contracts and the Motion by Chapter 7 Trustee for Authority to Sell by Private Sale Certain Assets of the Debtors Free and clear of All Liens, Claims, Encumbrances and Interests.

By the Court,

*Joan N. Feeney*
Joan N. Feeney
United States Bankruptcy Judge

Dated: October 23, 2006
cc: William J. Hanlon, Esq., Thomas Van Gel, Esq., Mark G. DeGiacomo, Esq., Robert L. Eisenbach, III, Esq., Andre Z. Schwartz, Esq.